JPL:KTF/BW/DIB
F. #2025R00609

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

25-CR-323 (S-1) (LDH)

DENIRO LASTER,
also known as "Niro," "Payso"
and "Peso," and
TERRY ROZIER,
also known as "Scary Terry" and
"Chum,"

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant U.S. Attorneys
(Of Counsel)

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

RELEVANT BACKGROUND ........ 2

- I. The Fraudulent Wagering Scheme ........ 2
- II. The Trip to Philadelphia to Pick Up the Bribe Proceeds ........ 3
- III. Counting the Bribe Proceeds in Charlotte ........ 4
- IV. The NBA's Investigation ........ 5
- V. Laster's Attempts to Tamper with Witnesses and Other Witness Outreach ........ 5

ARGUMENT ........ 9

- I. The Court Should Exclude the Text "Dont tell chum bout the bet" ........ 9
  - A. Applicable Law ........ 10
    - 1. The Rule Against Hearsay ........ 10
    - 2. Hearsay and the Admissibility of Commands and Questions ........ 12
    - 3. Attorney-as-Witness ........ 15
  - B. Argument ........ 16
    - 1. The Text is Hearsay ........ 16
    - 2. The Text is Irrelevant ........ 18
    - 3. Admission of the Text Creates an Attorney-as-Witness Problem ........ 20
    - 4. Admission of the Text Would Be Confusing, Misleading, and Will Waste Time ........ 22
- II. The Court Should Admit Evidence that Rozier Paid Co-Conspirators' Legal Fees ........ 24
  - A. Applicable Law ........ 24
  - B. Argument ........ 25

III. The Court Should Admit Lay Witness Testimony From Treating Medical Professionals ........ 27

A. Relevant Facts ........ 27

B. Applicable Law ........ 27

C. Argument ........ 28

IV. The Court Should Admit Evidence of Attempted Obstruction and Tampering as Evidence of Consciousness of Guilt, or, in the Alternative, if the Defendants Open the Door ....... 29

V. The Court Should Admit Relevant Factual Evidence Relating to the NBA's Investigation, But Preclude Evidence or Argument that the NBA's Investigation Exonerated Rozier .. 30

A. Applicable Law ........ 30

1. Evidence of Consciousness of Guilt is Relevant and Admissible ........ 30

2. Evidence of the NBA's Findings is Irrelevant and Prejudicial ........ 31

B. Argument ........ 33

1. The Court Should Admit Evidence Relating to the Defendants' Conduct in Connection with the NBA Investigation ........ 33

2. The Court Should Preclude Evidence or Argument Relating to the NBA's Findings in Connection with Its Investigation ........ 34

VI. The Court Should Preclude Evidence or Argument Regarding the Government's Motives, Charging Decisions and Investigative Techniques, or Potential Punishment ........ 35

A. Applicable Law ........ 36

B. Argument ........ 37

VII. The Court Should Preclude the Defendants From Raising or Arguing Purported Misconduct by the Victims or Any Lack of Harm to the Victims ........ 37

VIII. The Court Should Preclude the Defendants From Introducing Improper Evidence of Good Character ........ 38

IX. The Court Should Preclude Rozier From Misstating the Law Governing the Affirmative Defense of Withdrawal ........ 39

CONCLUSION ........ 40

TABLE OF AUTHORITIES


Page(s)

Cases

Anderson v. United States,
417 U.S. 211 (1974) .......... 10

Bohan v. Kuhlmann,
234 F. Supp. 2d 231 (S.D.N.Y. 2002) .......... 29

Ciak v. United States,
59 F.3d 296 (2d Cir. 1995) .......... 15

Duttle v. Bandler & Kass,
No. 82-CV-5084 (KMW), 1990 WL 113187 (S.D.N.Y. July 25, 1990) .......... 32

In re Shargel,
742 F.2d 61 (2d Cir. 1984) .......... 24, 25

In re Terrorist Bombings,
552 F.3d 93 (2d Cir. 2008) .......... 11

Kousisis v. United States,
605 U.S. 114 (2025) .......... 38

Lefcourt v. United States,
125 F.3d 79 (2d Cir. 1997) .......... 25, 31

Prince v. Lockhart,
971 F.2d 118 (8th Cir. 1992) .......... 32

Puglisi v. Town of Hempstead Sanitary District No. 2,
No. 11–CV–0445 (PKC), 2013 WL 4046263 (E.D.N.Y. Aug. 8, 2013) .......... 27, 28

Shannon v. United States,
512 U.S. 573 (1994) .......... 36

Stringham v. Carmel Clay Schools,
No. 22-CV-817 (TWP), 2024 WL 51185 (S.D. Ind. Jan. 4, 2024) .......... 14

United States v. Abel,
469 U.S. 45 (1984) .......... 26

United States v. Abreu,
342 F.3d 183 (2d Cir. 2003) .......... 14

United States v. Allen,
201 F.3d 163 (2d Cir. 2000) .......... 37

United States v. Armstrong,
517 U.S. 456 (1996) .......... 36

United States v. Arrington,
867 F.2d 122 .......... 16, 21

United States v. Battaglia,
No. 05-CR-774, 2008 WL 144826 (S.D.N.Y. Jan. 16, 2008) .......... 38

United States v. Bellomo,
176 F.3d 580 (2d Cir. 1999) .......... 12, 18, 19

United States v. Bilzerian,
926 F.2d 1285 (2d Cir. 1991) .......... 29

United States v. Brown,
No. 07-CR-874 (KAM), 2009 WL 497606 (E.D.N.Y. Feb. 26, 2009) .......... 32

United States v. Cardascia,
951 F.2d 474 (2d Cir. 1991) ........ 18
United States v. Carpenter,
372 F. Supp. 3d 74 (E.D.N.Y. 2019) ........ 31
United States v. Cruz,
894 F.2d 41 (2d Cir. 1990) ........ 11
United States v. Cunningham,
672 F.2d 1064 (2d Cir. 1982) ........ 15
United States v. Dawkins,
999 F.3d 767 (2d Cir. 2021) ........ 12, 19, 30
United States v. Diaz,
176 F.3d 52 (2d Cir. 1999) ........ 29
United States v. Dupree,
706 F.3d 131 (2d Cir. 2013) ........ 13
United States v. Farhane,
634 F.3d 127 (2d Cir. 2011) ........ 36
United States v. Flaherty,
295 F.3d 182 (2d Cir. 2002) ........ 39
United States v. Gambino,
818 F. Supp. 536 (E.D.N.Y. 1993) ........ 32
United States v. Graham,
477 F. App'x 818 (2d Cir. 2012) ........ 11
United States v. Halteh,
224 F. App'x 210 (4th Cir. 2007) ........ 32
United States v. Hwa,
161 F.4th 127 (2d Cir. 2025) ........ passim
United States v. Inniss,
No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) ........ 39
United States v. Iorizzo,
786 F.2d 52 (2d Cir. 1986) ........ 15, 21
United States v. Irvin,
787 F.2d 1506 (11th Cir. 1986) ........ 32
United States v. Jones,
381 F.3d 114 (2d Cir. 2004) ........ 15
United States v. Jones,
808 F.2d 561 (7th Cir. 1986) ........ 32
United States v. Kaiser,
609 F.3d 556 (2d Cir. 2010) ........ 23
United States v. Kandasamy,
No. 06-CR-616 (RJD), 2008 WL 4224276 (E.D.N.Y. Sept. 11, 2008) ........ 25
United States v. Kerley,
643 F.2d 299 (5th Cir. 1981) ........ 32
United States v. Klein,
No. 16-CR-442 (JMA), 2017 WL 1316999 (E.D.N.Y. Feb. 10, 2017) ........ 32, 35
United States v. Knox,
687 F. App'x 51 (2d Cir. 2017) ........ 36

United States v. Kuthuru,
665 F. App'x 34 (2d Cir. 2016) ..... 12
United States v. Kwang Fu Peng,
766 F.2d 82 (2d Cir. 1985) ..... 15, 21
United States v. Leslie,
658 F.3d 140 (2d Cir. 2011) ..... 39
United States v. Liszewski,
No. 06-CR-130 (NGG), 2006 WL 2376382 ..... 16, 21
United States v. Locascio,
6 F.3d 924 ..... 15, 21
United States v. Malpiedi,
62 F.3d 465 (2d Cir. 1995) ..... 31
United States v. Marrero-Ortiz,
160 F.3d 768 (1st Cir. 1998) ..... 32
United States v. Panebianco,
543 F.2d 447 (2d Cir. 1976) ..... 29
United States v. Parness,
503 F.2d 430 (2d Cir. 1974) ..... 30
United States v. Perez,
387 F.3d 201 (2d Cir. 2004) ..... 29
United States v. Pulliam,
973 F.3d 775 (7th Cir. 2020) ..... 14
United States v. Raniere,
No. 18-CR-2041 (NGG), 2019 WL 2163189 (E.D.N.Y. May 16, 2019) ..... 25
United States v. Rivera,
No. 13-CR-149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ..... 38
United States v. Robinson,
635 F.2d 981 (2d Cir. 1980) ..... 31
United States v. Roldan-Zapata,
916 F.2d 795 (2d Cir. 1990) ..... 11
United States v. Romanello,
No. 22-CR-194 (EK), 2023 WL 8480071 (E.D.N.Y. Dec. 6, 2023) ..... 14
United States v. Rosado,
728 F.2d 89 (2d Cir. 1984) ..... 36
United States v. Saldarriaga,
204 F.3d 50 (2d Cir. 2000) ..... 36, 37
United States v. Summers,
414 F.3d 1287 (10th Cir. 2005) ..... 14
United States v. Thomas,
377 F.3d 232 (2d Cir. 2004) ..... 37
United States v. Torres,
794 F.3d 1053 (9th Cir. 2015) ..... 14
United States v. Viserto,
596 F.2d 531 (2d Cir. 1979) ..... 32
United States v. Watts,
934 F. Supp. 2d 451 (E.D.N.Y. 2013) ..... 39

United States v. Zhong,
26 F.4th 536 (2d Cir. 2022) ..... 31
United States v. Zhong,
No. 16-CR-614 (DLI), 2018 WL 6186474 (E.D.N.Y. Nov. 26, 2018) ..... 31

Statutes
18 U.S.C. § 224 ..... 1
18 U.S.C. § 1349 ..... 1
18 U.S.C. § 1956(h) ..... 1
18 U.S.C. § 3500 ..... 20

Rules
FRE 101 ..... 9
FRE 102 ..... 10
FRE 401 ..... 10, 12, 19, 38
FRE 401(a) ..... 10
FRE 402 ..... 10, 38
FRE 403 ..... 10, 11, 20, 21, 38
FRE 404 ..... 39
FRE 405 ..... 39
FRE 405(a) ..... 39
FRE 801 ..... 11
FRE 801(c) ..... 10
FRE 801(d) ..... 11
FRE 802 ..... 10
FRE 803(3) ..... 18
FRE 805 ..... 11
FRE 1101 ..... 9

Other Authorities
2 McCormick on Evid. § 245 ..... 10
2 McCormick On Evid. § 246 ..... 13

## PRELIMINARY STATEMENT

The defendants Terry Rozier and Deniro Laster are charged with participation in a scheme whereby Rozier, in exchange for a bribe, agreed to remove himself early from a professional basketball game so that others could bet on, and profit from, his underperformance. For their conduct, a grand jury indicted the defendants on (i) wire fraud conspiracy, in violation of 18 U.S.C. § 1349; (ii) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); (iii) bribery in sporting contests, in violation of 18 U.S.C. § 224; and (iv) honest services wire fraud conspiracy, in violation of 18 U.S.C. § 1349. Trial is scheduled to begin on February 8, 2027.

The government respectfully submits this memorandum of law in support of its motions in limine to: (1) exclude a March 29, 2023 text from Laster to a friend; (2) admit evidence that Rozier is paying Laster and other co-conspirators' legal fees; (3) admit lay witness testimony from medical professionals who treated Rozier prior to and following the March 23, 2023 National Basketball Association ("NBA") game between the Charlotte Hornets and the New Orleans Pelicans (the "March 23 Game"); (4) admit evidence of attempted obstruction and tampering as evidence of consciousness of guilt; (5) admit relevant factual evidence relating to the NBA's investigation, but preclude evidence or argument that the NBA's investigation exonerated Rozier; (6) preclude evidence or argument regarding the government's motives, charging decisions or investigative techniques, or potential punishment; (7) preclude argument regarding purported misconduct by the victims or lack of harm to the victims; (8) preclude improper evidence of good character; and (9) preclude argument that misstates the law governing the affirmative defense of withdrawal.

For the reasons set forth herein, the government's motions in limine should be granted.

## RELEVANT BACKGROUND[1]

### I. The Fraudulent Wagering Scheme

The trial evidence will establish that Rozier, Laster, and various co-conspirators engaged in a scheme whereby Rozier, who was an NBA player at the time, agreed to prematurely exit the March 23 Game with the knowledge that co-conspirators would place bets on his underperformance, in exchange for a $100,000 bribe. Laster's role in the scheme was as intermediary between Rozier and the network of bettors.

As early as February 2023, Rozier agreed, in exchange for a bribe, to underperform with respect to scoring points in a future NBA game to enable others to successfully wager on his underperformance in that game. Several days before March 23, 2023, the co-conspirators settled on the March 23 Game, and various co-conspirators began coordinating the placement of large wagers at online and retail sportsbooks throughout the country. Because of sportsbooks' betting limitations on an individual athlete's propositions (referred to as "prop bets" or "props"), the co-conspirators had to place a variety of different types of bets, including parlays, relying on more statistics than just points, in order to garner a sufficient profit from the scheme. Thus, shortly before tip-off, co-conspirators asked Laster, for the first time, to convey to Rozier that he needed to go under on other statistics beyond points, including rebounds.

As planned among the co-conspirators, Rozier removed himself from the March 23 Game in the first quarter and did not return. As a result of his premature withdrawal, Rozier underperformed with respect to his per-game averages of points, assists and three-pointers and

[1] The proffer of facts set forth herein, including as to any witness's anticipated testimony, does not purport to provide a complete statement of all facts, evidence, or testimony of which the government is aware or will seek to introduce at trial.

below the lines set by oddsmakers for the March 23 Game. Rozier, however, collected four rebounds, which was above the line of 3.5 rebounds set by many oddsmakers that day. Because Rozier went over the betting line on his rebounds, certain bets placed by the co-conspirators on Rozier's underperformance that included rebounds as a feature of the bet lost.[2] Shortly after Rozier removed himself from the game, a co-conspirator texted Laster "No way bro . . . U didn't tell him," frustrated that Laster had failed to adequately convey the change in plans to include bets on Rozier's rebounds.

Regardless, many of the co-conspirators' bets still won, and the co-conspirators fraudulently obtained from the Betting Companies substantial profits on the March 23 Game. The co-conspirators renegotiated the bribe amount down to $70,000 as a result of Rozier not underperforming with respect to rebounds.

## II. <u>The Trip to Philadelphia to Pick Up the Bribe Proceeds</u>

On March 28, 2023, Laster traveled on less than a day's notice to Philadelphia, Pennsylvania (from his home in Charlotte, North Carolina, where he lived with Rozier) to pick up the $70,000 from co-conspirators. Rozier paid for Laster's travel.

Shortly after landing in Philadelphia, Laster reached out to a friend of Rozier's who grew up in Philadelphia (the "Friend"). Laster asked the Friend for help buying marijuana and finding a rental car in Philadelphia, which Laster planned to drive back to Rozier's house in Charlotte, North Carolina.

Late that evening of March 28, 2023, Laster picked up from a co-conspirator a duffle bag stuffed with $70,000 in bundled hundred-dollar bills. Shortly after retrieving the cash,

---

[2] Prop bets based on the cumulative total of various statistics that included rebounds were still successful.

Laster texted Rozier "U dont wanna see 👀," Rozier and Laster Facetimed, and Laster took photographs of himself holding the stacks of Rozier's cash. Laster then went to a casino where he gambled into the early morning hours of March 29, 2023.

The morning of March 29, 2023, Laster texted the Friend to follow up on getting a rental car and marijuana. Laster and the Friend then spoke on Facetime (the "Facetime Call"), after which Laster texted the Friend, "Dont tell chum bout the bet" (the "Text"). There is no dispute that Chum was a nickname that Laster used for Rozier. On the evening immediately preceding the Text, Laster engaged in gambling activity and financial dealings in Philadelphia unrelated to the charged scheme that provide alternative explanations for the Text's reference to a "bet." And as discussed further below, the Friend has provided sworn testimony unequivocally denying that the Text was in any way related to betting on Terry Rozier or the March 23 Game.

Ultimately, while Laster was in Philadelphia, the Friend put Laster in touch with people to help him get marijuana and a rental car. Laster left Philadelphia very late the evening of March 29, 2023. Driving through the night, he arrived at Rozier's house in Charlotte, North Carolina in the afternoon of March 30, 2023.

III. Counting the Bribe Proceeds in Charlotte

The next night, March 31, 2023, the Charlotte Hornets had a home game that Rozier attended, although he did not play. Near the end of the game, Rozier texted Laster, "Ima count the money when we back." Approximately 90 minutes later, Rozier and Laster took a picture of themselves counting the cash in Rozier's kitchen.

Less than a week later, Laster texted Fairley that he and Rozier were setting up another unders bet, this one involving one of Rozier's then-teammates. Around the same time, Laster reached out directly to a different then-NBA player he was friendly with and wrote: "Lmk

if u tryna make 100k gang."

IV. The NBA's Investigation

Shortly after the March 23 Game, the NBA was alerted of suspicious wagers on Rozier's underperformance in the March 23 Game. The NBA then opened an investigation regarding whether the NBA's rules had been violated in connection with the March 23 Game. Laster and Rozier, among others, were interviewed as part of the NBA's investigation. Both Rozier and Laster lied during those interviews. In addition, prior to providing one of his phones to the NBA for review, Rozier deleted communications with multiple co-conspirators. Rozier also failed to provide his second phone to the NBA for review. The NBA's investigation into Rozier's conduct in connection with the March 23 Game remains open, and the NBA has not cleared Rozier.

On October 16, 2025, the government charged the defendants with wire fraud and money laundering conspiracy. Following the unsealing of the indictment in this case, the NBA placed Rozier on administrative leave. The government superseded the indictment to add bribery charges in May 2026.

V. Laster's Attempts to Tamper with Witnesses and Other Witness Outreach

After the government opened its investigation, Laster repeatedly attempted to obstruct the investigation and influence witness testimony. Among other things, Laster contacted witnesses to discuss what they should say about the case, suggested through an intermediary that a perceived witness should not testify, and directed a rat emoji at a perceived witness on social media. Based on this conduct, the Court revoked Laster's bond on August 11, 2026. See ECF No. 130; Minute Entry, Aug. 11, 2026. The government has also learned that: (i) Rozier and Laster communicated after indictment in violation of both defendants' bond conditions, see ECF No. 161; (ii) Laster discussed the prosecution with the Friend both before

and after the Friend first testified [redacted], described further below; and (iii) Rozier spoke with the Friend about the case shortly before the Friend first testified [redacted]

These facts are particularly significant because Rozier has repeatedly and publicly identified the Text "Dont tell chum bout the bet," sent from Laster to the Friend, as central to his defense. By doing so, Rozier has made clear that the Friend is an important defense witness. But although the Friend's recollection has evolved over time, one aspect of his account has remained constant: he has repeatedly and unequivocally denied under oath that the Text concerned betting on Rozier, the March 23 Game, or any effort by Laster to conceal such betting from Rozier.

The Friend has spoken with the government on four occasions. He was interviewed by law enforcement twice in January 2026 and later testified [redacted] twice, first in April 2026 and again, under a grant of immunity, in November 2026 as part of the government's ongoing investigation into witness tampering and obstruction of justice. Before the Friend's first [redacted] appearance, the Court appointed counsel to represent him (the "CJA Counsel"). By letters dated March 27, 2026 and June 30, 2026 (the "Government Letter"), the government advised counsel for Rozier that the Friend was represented by counsel in connection with this matter and provided the CJA Counsel's contact information.

Throughout these proceedings, the Friend consistently denied that the Text had anything to do with betting on Rozier or the March 23 Game or that he has any independent knowledge of the allegations in the Superseding Indictment. At the same time, he detailed a series of private communications between him and Laster, Rozier, and Rozier's agents outside of the presence of his CJA Counsel, after which contacts the Friend's account changed in ways that

Rozier may view as favorable. Specifically:

- First Government Interview: During his January 12, 2026, interview with the FBI, the Friend stated that everything he knew about the investigation came from what he had learned from reading news reports. The FBI did not ask about the Text.

- Second Government Interview: During a second interview on January 23, 2026, after reviewing his March 2023 communications with Laster, including the Text, the Friend stated that he did not remember the Text and recalled that the Facetime Call with Laster immediately preceding the Text was a discussion pertaining to marijuana, how Rozier was doing generally, and Laster's interest in a casino. The Friend further stated that he had never spoken with Rozier or Laster about gambling or sports fixing, including during the Facetime Call, and that he had not spoken with either defendant since their arrests.

- First [redacted] Appearance: During his April 2, 2026 [redacted] appearance, the Friend again unequivocally denied ever speaking with Laster, Rozier, or anyone acting on Rozier's behalf about sports betting or sports fixing. However, he also disclosed that, after first speaking with the government, he exchanged disappearing-message communications with both Rozier and Laster concerning the case.

    - The Friend further testified that, after communicating with Rozier, an investigator working for Rozier contacted him approximately 10 to 15 times over a period of several days seeking information about what the Friend had discussed with the government. The Friend testified that he had not discussed sports betting with the investigator, did not recall telling the investigator anything different than what he had told the government, and had been truthful in his prior statements to the government.

- Second [redacted] Appearance: During his November 4, 2026 immunized [redacted] testimony, the Friend acknowledged that he had discussed the government's investigation with Laster both before and after his first [redacted] appearance, including discussions concerning the Text and the Facetime Call. The Friend further testified that, after his first appearance, Laster told him that "they're after Terry," that the government had "got his phone . . . got all his stuff," and that Laster intended to "take whatever I got to take."

    - The Friend also testified in November 2026 that, between his first and second [redacted] appearances, he had multiple conversations with current counsel for Rozier, including two or three conversations alone with lead defense counsel. The Friend testified that those communications occurred without the consent of the CJA Counsel and that the Friend did not recall discussing with defense counsel whether he was represented. Counsel for Rozier has since confirmed that, after attempting to reach the CJA Counsel with no response, counsel for Rozier contacted the Friend directly for the first time on or about July 23, 2026, approximately three weeks after receiving the Government Letter notifying defense counsel that the Friend was represented by the CJA Counsel. Rozier's counsel also advised the government that counsel texted the Friend asking if he had a lawyer, and that the Friend later indicated over the phone that he did not.

- According to the Friend's November 2026 testimony, counsel for Rozier discussed the Text with him on multiple occasions and asked him to confirm that "Terry knew nothing." Counsel for Rozier has also informed the government that Rozier's investigator prepared a report dated March 2, 2026 reflecting that the Friend supposedly stated, during one of the investigator's 10 to 15 communications with him, that the Text referred to Laster betting on Rozier in connection with the March 23 Game. Notably, that account is inconsistent with the Friend's sworn testimony, including his immunized [redacted] testimony, in which he repeatedly denied that the Text concerned betting on Rozier or the March 23 Game (he also denied saying anything like that to Rozier's investigator).

- The Friend's account of the Facetime Call expanded after these defense contacts. Whereas the Friend had previously described the Facetime Call as relating to marijuana, going to casinos, and Rozier's general wellbeing, he later recalled a broader conversation in which Laster described himself as a heavy sports bettor and casino gambler, discussed betting on overseas basketball, told the Friend that player props were "where the money at" and encouraged the Friend to wager on player props.

But even after the Friend expanded his description of the Facetime Call to include the topic of player props—which occurred after the Friend communicated with the defendants and Rozier's representatives—the Friend continued to reject the central premise of Rozier's defense. Under oath, the Friend repeatedly denied that he and Laster ever discussed: (1) betting on Rozier; (2) betting on the March 23 Game; (3) any specific wager placed by Laster, including a sports wager; or (4) any secret concerning betting, including betting involving Rozier. Thus, although certain peripheral details of the Friend's recollection changed over time in ways that Rozier may view as helpful, his testimony remained unwavering that the Text was not about betting on Rozier or the March 23 Game.

Of particular relevance to these motions in limine, the Friend's account of the Facetime Call changed only after repeated communications with Laster, Rozier, Rozier's investigator, and defense counsel. To the extent the evolution of the Friend's testimony may be viewed as marginally more favorable to Rozier, it occurred only after a series of private

communications with key participants in this case, rendering those communications relevant and highly probative should the Friend testify at trial.

## ARGUMENT

### I. The Court Should Exclude the Text "Dont tell chum bout the bet"

The Court should exclude the Text on multiple grounds. First, the Text is hearsay and should be excluded under Rule 802. Second, because the Text has no independent relevance outside of the impermissible hearsay, it should be excluded under Rule 401. Third, even if the Court determines that the mere fact that Laster sent the Text has some independent relevance, the minimally probative value of that fact is substantially outweighed by the risk of confusing the issues, misleading the jury, wasting time and raises an attorney-as-witness issue that creates an unwaivable conflict prejudicing the government. The Text should be excluded under Rule 403.

Rozier has repeatedly claimed—and will no doubt argue at trial if permitted—that the Text shows that Laster hid the scheme to bet on Rozier's underperformance from Rozier. That argument is premised on two assumptions: (1) when Laster told the Friend not to tell Rozier about the "bet," Laster was referring to the bets placed on Rozier's unders in the March 23 Game, and not some other bet, and (2) Laster did not want the Friend to tell Rozier about the "bet" because Laster concealed the betting scheme from Rozier. As discussed herein, these assumptions are not supported by the evidence in the case and, in any event, ask the jury to rely on the supposed truth of the matter asserted in the Text. Because the Text only has the exculpatory effect that Rozier claims it has if the jury considers the Text for the truth of the matter supposedly asserted therein, it is inadmissible hearsay. Further, because the Text has no independent or "non-truth" relevance (such as to explain why the message recipient followed the command, or because the fact that it was said is independently relevant), the Text is irrelevant and therefore inadmissible under Rule 401. And, because admitting the Text would require the

government to affirmatively rebut Rozier's unsupported theory of the factual assertion within the Text, the Text should be precluded under Rule 403 because such an exercise would undoubtedly confuse the issues, mislead the jury, and needlessly and substantially prolong the trial.

A. Applicable Law

The Federal Rules of Evidence (the "Rules" or "FRE") govern the admission of evidence in federal jury trials. FRE 101; FRE 1101. Adherence to the Rules is important "to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." FRE 102. Evidence is admissible only if it is relevant—having "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," FRE 401(a)—and not otherwise inadmissible, FRE 402. Even if a piece of evidence satisfies FRE 401's relevance standard, a court may still exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403.

1. The Rule Against Hearsay

The Rules exclude the admission of hearsay. FRE 802. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." FRE 801(c). The Rules mandate the exclusion of hearsay due to hearsay's inherent unreliability. See Anderson v. United States, 417 U.S. 211, 220 (1974); 2 McCormick on Evid. § 245 (9th ed.) ("In order to encourage witnesses to put forth their best efforts and to expose inaccuracies that might be present with respect to any of the foregoing factors, the[re are] three conditions under which witnesses ordinarily are required to testify: oath, personal presence at the trial, and cross-

examination. The rule against hearsay is designed to ensure compliance with these ideal conditions[.]").

Despite the hearsay rule, certain out-of-court statements are still admissible at trial (subject to FRE 403's balancing). Statements that are not offered for "the truth of the matter asserted" are, definitionally, not hearsay. FRE 801. Statements by a party-opponent—a category that includes statements made by a co-conspirator in furtherance of the conspiracy—are excluded from the definition of hearsay and are therefore admissible for their truth when offered by the government (but not the defendant). FRE 801(d).[3] Prior inconsistent statements are also excluded from the definition of hearsay and admissible for their truth. Id. In addition, there are approximately two dozen exceptions to the hearsay rule permitting the admission of certain out-of-court statements offered for their truth, including exceptions for reliable documents (business records, public records, religious records, et cetera) and reliable statements (dying declarations, statements made for medical treatment, excited utterances, et cetera). Statements containing multiple levels of hearsay must clear every hearsay hurdle before the statement is admissible at trial. FRE 805; see, e.g., United States v. Hwa, 161 F.4th 127, 142 (2d Cir. 2025); United States v. Cruz, 894 F.2d 41, 44 (2d Cir. 1990). The hearsay rules are essential to protect against admission of unreliable statements and the distortion of the jury trial's truth-seeking function.

[3] The government intends to admit statements by the defendants and their co-conspirators. With the exception of the Text, the government does not at this time ask the Court to rule on the admissibility of any particular out-of-court statements by the defendants or their co-conspirators that the government intends to offer. Although the government presumes the Court is quite familiar with the law relating to the admissibility of co-conspirator statements, the government briefly notes that "[a] statement is in furtherance of a conspiracy if it was in some way designed to promote or facilitate achievement of the goals of that conspiracy." United States v. Graham, 477 F. App'x 818, 822 (2d Cir. 2012). "Co-conspirator statements may include attempts to cover up an ongoing conspiracy after the participants have been arrested." United States v. Roldan-Zapata, 916 F.2d 795, 803-04 (2d Cir. 1990). Finally, though Rule 801(d)(2)(E) "requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." In re Terrorist Bombings, 552 F.3d 93, 139 (2d Cir. 2008).

2. Hearsay and the Admissibility of Commands and Questions

Just like any other out-of-court statement that is offered for some purpose other than the truth of the matter asserted therein, a command can be offered for non-hearsay purposes. For example, a command can be offered to prove that the person who gave the command had the power to give the command; or to provide context to explain why a person took certain action (i.e., because they were commanded to do so). Indeed, "[q]uestions and commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted." United States v. Kuthuru, 665 F. App'x 34, 38 (2d Cir. 2016); see also United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021) ("The statement '[d]o not accept money from these people' was an order, i.e., an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said."); United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) (witness testimony about mafia boss's order to kill someone was not hearsay because "[s]tatements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). When a command or question is offered for some purpose other than the truth of the matter asserted, there must be some independent relevance to the command or question itself, otherwise it would be inadmissible under FRE 401. "[W]hile declarative statements may occasionally be offered, not to prove their truth, but solely for the limited purpose of proving that they were made, they may be admitted only if the mere fact that they were made is relevant to some issue in the case." Hwa, 161 F.4th at 143 (emphasis in original).

However, it is not the case that any statement that is phrased as a command or a question is automatically not hearsay because of its phraseology. As a leading evidence treatise has explained:

> Despite the importance of forms of the word ‘assert’ in the definition of hearsay, that term is nowhere defined . . . [A]s a consequence, contemporary courts sometimes exclude from the hearsay definition questions or imperative statements apparently categorically (or at least ordinarily) because they are not directly assertive. More appropriately nuanced opinions find such statements hearsay despite their form if the circumstances and/or wording demonstrate an intent to assert.

2 McCormick On Evid. § 246 (9th ed.) (emphasis added) (citations omitted); see also 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence, § 8.6, at 57 (4th ed. 2013) (“For purposes of the hearsay doctrine [ ] the term ‘assertion’ or ‘statement’ includes questions and imperatives that express or communicate facts or information about acts, events, or conditions in the world. Indeed, such formulations of human expression are as much within the hearsay doctrine as simple declarative sentences.”); 4 Clifford S. Fishman & Anne T. McKenna, Jones on Evidence, § 24:13, 168 (7th ed. Supp. 2012) (“An utterance that is in the form of a question can in substance contain an assertion of fact.” (quotation marks and citation omitted)).

Put differently, if a party seeks to introduce a command or question to prove the content of what was asserted in the command or question—even if that content is implied—courts must assess the proffered statement on hearsay grounds. As the Second Circuit recently held: “If the mere fact that the declarant made the statement is irrelevant, it is not admissible to show that she made it; and if what would be relevant is the content of what she said, then the statement is irrelevant unless it was true, in which case it would be hearsay.” Hwa, 161 F.4th at 143 (emphasis in original) (internal quotations marks omitted). Thus, courts in this Circuit do not merely engage in a superficial analysis of the form of a statement when considering its admissibility; where a statement contains an embedded statement offered for its truth, courts apply the hearsay analysis to the embedded statement. Hwa, 161 F.4th at 142; see also United States v. Dupree, 706 F.3d 131, 137 (2d Cir. 2013) (conducting hearsay analysis of prior court

order that "consist[ed] primarily of imperative statements" before ultimately admitting the order because the government was not offering the order "for the truth of some assertion that it implies" but rather because the "significance of the Order lies in the fact that it issued"); United States v. Abreu, 342 F.3d 183, 190 (2d Cir. 2003) (rejecting the defendant's characterization of an out-of-court statement as non-hearsay where the jury could draw the defendant's proffered inferences relating to the statement only by accepting the statement as true); United States v. Romanello, No. 22-CR-194 (EK), 2023 WL 8480071, at *3 (E.D.N.Y. Dec. 6, 2023) (conducting hearsay analysis to the command, "REGAN advised BEXHETI when money was owed, not to threaten the gamblers").

Numerous other courts are in alignment with the Second Circuit that this multi-level analysis is appropriate when considering the admissibility of statements containing implied assertions formed as questions and, as relevant here, commands. E.g., United States v. Pulliam, 973 F.3d 775, 783-84 (7th Cir. 2020) (concluding that the statement, "What gun?" was inadmissible hearsay and explaining that "the intent behind a remark dictates whether it is a statement or a question for hearsay purposes . . . [a]nd the context surrounding the remark may help us ascertain the declarant's intent"); United States v. Torres, 794 F.3d 1053, 1056 (9th Cir. 2015) ("although some questions and inquiries may constitute non-hearsay[,] where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the hearsay definition"), cert. denied, 578 U.S. 978 (2016) (cited approvingly in Hwa); United States v. Summers, 414 F.3d 1287, 1300 (10th Cir. 2005) (excluding as hearsay co-defendant's question, upon being arrested, "How did you guys find us so fast?" because the question "clearly contained an inculpatory assertion" and "intimated both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime

so quickly"); Stringham v. Carmel Clay Schools, No. 22-CV-817 (TWP), 2024 WL 51185, at *12 (S.D. Ind. Jan. 4, 2024) (precluding as inadmissible hearsay a "question, [that] when considered with the statement that immediately followed, along with the context provided by [plaintiff]'s narrative in her first internal complaint, was a substantive assertion meant to posit a proposition that may be true or false.")

3. Attorney-As-Witness

A lawyer is generally barred from acting as both an advocate and a witness in the same proceeding. Model Rules of Professional Conduct Rule 3.7(a); Ciak v. United States, 59 F.3d 296, 304-05 (2d Cir. 1995).

In particular, when a witness is expected to testify about a relevant conversation with counsel, a conflict of interest exists if the lawyer ought to be a rebutting witness, "either to deny the conversation, or to provide an innocent explanation for the jury to consider." United States v. Cunningham, 672 F.2d 1064, 1074 (2d Cir. 1982) (approving disqualification of lawyer and his firm if district judge determined on remand that testimony of witness admissible). Whether or not the lawyer actually testifies, by questioning the witness at trial and by arguing in summation about what the conversation means, the lawyer becomes an unsworn witness. United States v. Iorizzo, 786 F.2d 52, 57 (2d Cir. 1986). "The risk that [a lawyer will] become a witness at trial [is] enough alone to . . . reach this determination [to disqualify]," United States v. Jones, 381 F.3d 114, 121 (2d Cir. 2004), provided that the testimony at issue is squarely relevant, United States v. Kwang Fu Peng, 766 F.2d 82, 87 (2d Cir. 1985).

Where defense counsel is entangled in the facts of the defendant's case such that he should either be available as a witness or would, upon remaining as defense counsel, "become an unsworn witness for the accused," it is counsel's ethical duty to withdraw, and upon failing to do so, counsel should be disqualified, regardless of the defendant's expressed willingness to

waive. United States v. Locascio, 6 F.3d 924, 931-34 (2d Cir. 1993). Because the government, not the defendant, is prejudiced, "waiver . . . by the defendant is ineffective in curing the impropriety in such situations." Id. at 931, 934; see also United States v. Arrington, 867 F.2d 122, 129 (2d Cir. 1989); Iorizzo, 786 F.2d at 57; Kwang Fu Peng, 766 F.2d at 87; United States v. Liszewski, No. 06-CR-130 (NGG), 2006 WL 2376382, at *3 (E.D.N.Y. Aug. 16, 2006).

B. Argument

The Text from Laster to the Friend stating "Dont tell chum about the bet" should be excluded from evidence in the upcoming trial.

1. The Text is Hearsay

As a threshold matter, the Text is inadmissible hearsay not subject to any exception. In a pre-motion meet-and-confer with the government, counsel for Rozier confirmed their intention to offer the Text into evidence and indicated their belief that the Text is admissible as a non-hearsay command. But at the same time they claim the Text is not hearsay, Rozier has repeatedly claimed that the Text proves his innocence, on the apparent theory that the Text is about Laster attempting to hide from Rozier that he bet on Rozier's underperformance in the March 23 Game. See ECF No. 124 at 1 ("On March 29, 2023 . . . Laster sent a text message to a third party that the Government produced in this case: 'Dont tell chum bout the bet.' 'Chum' is Mr. Rozier's nickname. The recipient answered, 'Hell no.' This should end the case. One does not hide a bet from the person who supposedly sold it."); ECF No. 158 at 1 ("Mr. Rozier's defense is simple. He did not know about any bets . . . . [O]n March 29, 2023, the same day the indictment claims Mr. Laster collected the cash in Philadelphia, he texted an associate: 'Don't tell chum bout the bet.' 'Chum' is Mr. Rozier."). But Rozier cannot have it both ways. Rozier cannot simultaneously contend that the Text is admissible because it is a command that contains no assertion, and that the same Text proves his innocence through the truth of the implied

assertions embedded within it.

This was precisely the dilemma observed by Chief Judge Brodie and the Second Circuit in Hwa, which is particularly instructive. In Hwa, the Second Circuit recently affirmed Chief Judge Brodie's exclusion on the basis of hearsay questions that contained within them assertions in the bribery trial of Goldman Sachs executive Roger Ng. Hwa, 161 F.4th at 142. Ng was charged with embezzling money and bribing Malaysian officials to do business with Goldman Sachs, for which he received a $35 million kickback. Ng denied that he had been a participant in the conspiracy and claimed the $35 million at issue were legitimate proceeds from an investment made with a co-conspirator (the "Cooperator"). Prior to trial, Ng moved for an in limine ruling allowing him to introduce into evidence a recorded conversation between Ng's wife and the Cooperator. Ng argued to the district court that statements in the recording would reliably establish that the $35 million were investment proceeds, not Ng's share of bribe proceeds. As relevant here, Ng argued that his wife's statements on the recording were not hearsay because they were in the form of questions and therefore not offered for their truth.

Judge Brodie denied admission of the statements on hearsay grounds, which the Second Circuit affirmed. The Second Circuit held:

> [W]hile declarative statements may occasionally be offered, not to prove their truth, but solely for the limited purpose of proving that they were made, they may be admitted only if the mere fact that they were made is relevant to some issue in the case. If the mere fact that the declarant made the statement is irrelevant, it is not admissible to show that she made it; and if what would be relevant is the content of what she said, then the statement is irrelevant unless it was true, in which case it would be hearsay.

Hwa, 161 F.4th at 143 (cleaned up; emphasis in original). Thus, the Circuit concluded that Ng's wife's "key statements"—"even if treated as questions—present a version of the classically objectionable 'When did you stop beating your wife' question that assumes, without foundation,

a prior beating." Hwa, 161 F.4th at 143 (emphasis in original). The "mere fact" that Ng's wife asked the question was "irrelevant to any issue" in the case. Id. at 144. "What would be relevant is the suggested event; and [Ng's wife's] statement or question was not relevant unless her implication that there had been such an event was true, in which case it would be hearsay." Id.

Rozier has made clear that the purpose of offering the Text is not "as evidence of [a] command[] . . . directed to the [Friend]," Bellomo, 176 F.3d at 586, or "solely for the limited purpose of proving that [the command was] made," Hwa, 161 F.4th at 143, but rather for the truth of the supposed assertion embedded in the command: that Laster had confided in the Friend that he bet on Rozier's underperformance in the March 23 Game and did not want the Friend to tell Rozier that Laster had bet on Rozier's underperformance because Rozier did not know that Laster had done so. This case thus fits cleanly into the Second Circuit's recent analysis in Hwa: "if what would be relevant [about the command] is the content of what [was] said, then the statement is irrelevant unless it was true, in which case it would be hearsay." Hwa, 161 F.4th at 143 (cleaned up; emphasis in original). Thus, even accepting for the sake of argument that the Text means what the defense asserts is its truth (it does not), because it is being relied on for its embedded truth, it is plainly hearsay.[4]

2. The Text is Irrelevant

But hearsay is not the only basis for the Text's exclusion. The Text should also be excluded as irrelevant. The mere fact that Laster texted "Dont tell Chum bout the bet" has no

[4] To the extent Rozier transitions to arguing that the Text is admissible under FRE 803(3)'s state-of-mind exception, that also fails. The inference that the Text reveals Laster's then-existing state of mind regarding the charged betting scheme only holds if the Text means what the defense says it means, thus failing for the same hearsay reasons. Further, Rule 803(3) only "permits the admission [] of statements of future intent." Hwa, 161 F.4th at 142. Here, the Text says nothing about Laster's own future intent or plan, only what he knew or believed about past events. Rule 803(3) does not permit such backward-looking use. Id.; United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991) (same).

relevance to the case unless it means what Rozier claims it means (rendering it inadmissible hearsay). It is not being offered to prove that the person who gave the command had the power to give the command; or to provide context to explain why a person took certain action (i.e., because they were commanded to do so). Cf. Dawkins, 999 F.3d at 789; Bellomo, 176 F.3d at 586. And, as described above, there is no credible evidence supporting the "truth of the matter" that the defense is "assert[ing]" through reliance on the Text—that Laster hid the betting scheme from Rozier—other than the Text itself.

Indeed, even in his most recent immunized testimony—where, after speaking with Laster and counsel for Rozier about the Text, he recalled new facts that were inconsistent with, and mutually exclusive from, his previous sworn [redacted] testimony—the Friend unequivocally denied that, during the Facetime Call, Laster spoke with him about betting on Rozier or the March 23 Game, and that Laster confided in the Friend in any way about anything secret.[5] And there is ample evidence suggesting that the Text refers to something else entirely, including, for example, that Laster lost some of Rozier's bribe proceeds the night before in the casino.

As in Hwa and Dawkins, there is little support in the record that the Text means what the defense claims it does, and the text has no independent relevance absent the embedded assertion that the defense seeks to argue. It therefore fails to satisfy the test for relevance set forth in FRE 401.

[5] The only contrary account is, apparently, Rozier's investigator's March 2026 report, although the government has not seen it. As an initial matter, there is no obvious reason for a defense investigator to call a witness 10 to 15 times about a text message the witness said he did not remember. This sequence of events raises obvious reliability concerns regarding the evolution of the Friend's account to the investigator, particularly when considered alongside the Friend's now-disappeared Snapchat conversations with Rozier and Laster that happened around the same time. More importantly, the account apparently contained in the investigator's report conflicts with the Friend's sworn, immunized testimony, and every other account the Friend has given before or since.

### 3. Admission of the Text Creates an Attorney-as-Witness Problem

One issue that permeates the Court's FRE 403 balancing analysis is the specter of lead defense counsel becoming an unsworn trial witness if the Text is admitted. If the Court admits the Text over the government's hearsay and relevance objections, the government, in order to satisfy its burden of proving Rozier's guilt beyond a reasonable doubt, will present evidence disproving the purported embedded assertion in the Text advanced by Rozier—that Laster discussed betting on Rozier with the Friend and wanted to hide something from Rozier. While this proof would entail many steps discussed further below, one such step would be examining the Friend about the fact that his sworn testimony materially changed after his private discussions with lead defense counsel. Any dispute about those conversations renders that attorney a witness, whether sworn or unsworn. Indeed, even if counsel recorded the private conversations (which we do not understand to be the case), he would still be a witness regarding the recording's authenticity.[6]

Although the government presently takes no position on whether defense counsel's direct outreach to the Friend after receiving no response from the CJA Counsel violated the relevant rule of professional conduct barring contact with a represented party, the government does anticipate eliciting the facts that such contact occurred outside of the presence of the Friend's CJA Counsel and without the CJA Counsel's consent. Such facts are highly

[6] We note that the mirror-image issue frequently arises with respect to cooperating witnesses, in which defense counsel seeks to impeach a witness about changes in their testimony after meeting with prosecutors. But unlike here, these situations do not pose attorney-as-witness disqualification issues because meetings between prosecutors and witnesses are held in the presence of law enforcement agents and documented in reports, which reports are produced to defense counsel pursuant to 18 U.S.C. § 3500 without any work-product privilege assertion. Thus, to the extent there is a dispute about what happened in a meeting between the government and a witness, the defense has the report with which to cross-examine the witness, and may call the agent witness to the stand rather than relying on the prosecutor as unsworn witness. Here, in contrast, the government understands there was no third party present on the phone calls between the Friend and lead defense counsel, rendering defense counsel an unsworn witness to those conversations with the Friend about the Text.

relevant to the Friend's susceptibility to having his recollection influenced in favor of his longtime friend Rozier, even assuming no improper intent on Rozier's counsel's behalf. And any factual testimony touching on defense counsel's potential unauthorized contact with a represented party creates a conflict of interest between Rozier and his counsel. The Court will need to conduct a Curcio inquiry, because arguments about admissibility of the Text could be influenced by defense counsel's desire to defend his conduct in speaking to the Friend after the CJA Counsel failed to respond to defense counsel's outreach. The government intends to shortly file a separate letter requesting a Curcio hearing.

Further, even if Rozier waives the conflict, it does not resolve the issue. In the event the Text is admitted at trial, having defense counsel as an unsworn witness would substantially prejudice the government. Because the government, not the defendant, is prejudiced, "waiver . . . by the defendant is ineffective in curing the impropriety" such that disqualification of that attorney would be the only viable option. Locascio, 6 F.3d at 931; see also Arrington, 867 F.2d at 129; Iorizzo, 786 F.2d at 57; Kwang Fu Peng, 766 F.2d at 87; Liszewski, 2006 WL 2376382, at *3. Although the disqualification issue is not yet ripe, in the event that the Text is admitted, the government anticipates moving to disqualify lead defense counsel. In order to avoid an eleventh-hour trial delay, or a mid-trial mistrial, we respectfully request that the Court address this issue well in advance of the pretrial conference. In the alternative, if the Text is properly excluded as hearsay and/or on relevance and FRE 403 grounds, the Friend's testimony will be irrelevant and so too will these attorney-as-witness issues.

All of these risks substantially outweigh the marginal probative value, if any, of the Text, counseling in favor of its exclusion from evidence.

4. Admission of the Text Would Be Confusing, Misleading, and Will Waste Time

Even putting aside the attorney-as-witness issue, and even if the Text were relevant non-hearsay, which it is not, the Text should be excluded under Rule 403(b). Rule 403(b) permits the Court to exclude relevant evidence if its probative value is substantially outweighed by a danger of confusing the issues, misleading the jury, and wasting time, among other reasons. Admission of the Text poses risks of all three injuries, and such risks substantially outweigh the Text's probative value, which is marginal at best.

Confusing the issues. For the reasons described above, the facts do not support Rozier's assertion about what the Text is referring to. But if the Court does not exclude the Text on hearsay or relevance grounds, the government, in order to debunk the defense's unsupported assertion about the meaning of the Text and prove its case beyond a reasonable doubt, will be required to present substantial additional evidence, even putting aside the evidence implicating the attorney-as-witness issue described above. The government will seek to present evidence on, among other things: (i) the Friend's relationship with Rozier and Laster, (ii) Laster's gambling activities and other transactions, including an illegal drug transaction involving the purchase of Percocet that took place the night before the Text, which will entail calling several additional witnesses, (iii) evidence to impeach Rozier's investigator's report, (iv) evidence about Laster, Rozier, the investigator's, and defense counsel's communications with the Friend and its effects on the Friend's testimony, and (v) many more text messages, including between Laster and the Friend, Laster and people he met at the casino, Laster and people he told about the casino, and the Friend and defense counsel. Litigating the meaning of the Text would require substantial additional testimony and evidence unrelated to the charged conduct, which risks confusing the jury about what they are being asked to decide.

Misleading the Jury. Admission of the Text would also mislead the jury since, for all the reasons described above, the Text is irrelevant to the charged scheme. In addition, admission of the Text for any non-hearsay purpose (which would be irrelevant) would significantly risk that the jury would consider the Text for its truth. See United States v. Kaiser, 609 F.3d 556, 572-73 (2d Cir. 2010) (holding that an out-of-court statement was inadmissible hearsay where its purported non-hearsay relevance depended on the truth of its underlying assertion, and that, in any event, Rule 403 required exclusion because its limited probative value was outweighed by the danger that the jury would consider it for its truth).

Mere admission of the Text suggests its relevance to the jury and opens the door to unsupported, misleading defense arguments that are untethered to the facts. Admission of the Text would also reward attempts to mislead the jury, because to the extent the Friend's [redacted] testimony changed marginally in favor of Rozier, it changed only after (i) the Friend exchanged since-deleted Snapchats with both Rozier and Laster; (ii) the Friend spoke with Rozier's investigator 10 to 15 times; (iii) Laster spoke with the Friend multiple times; and the Friend had private conversations with lead counsel for Rozier.

Of all the rules of evidence, Rule 403 in particular gives judges wide discretion to ensure a fair trial. Where marginally helpful or marginally relevant evidence has been procured only after sustained attempts by defendants to influence a friend-turned-witness, the Court should exercise its discretion to exclude such evidence and ensure those attempts will not also bleed into misleading the jury.

Wasting Time. In order to disprove the defense's theory of the meaning of the Text, the government is prepared to prove all of the facts described above in the manner described above, as well as likely needing to seek counsel's disqualification for the reasons

discussed above. But this will be a complete waste of time and needlessly prolong the trial. Such a lengthy, detailed minitrial into the meaning of one six-word text message is unnecessary, because the Text should not be admitted in the first place.

For these reasons, the Court should exclude the Text.[7]

II. The Court Should Admit Evidence that Rozier Paid Co-Conspirators' Legal Fees

The Court should admit evidence that Rozier has paid the legal fees of multiple co-conspirators in connection with this case, including Laster and his two siblings, his brother ("Laster's Brother"), who is identified as Co-Conspirator 7 in the Superseding Indictment, and his sister ("Laster's Sister") (collectively, "the Lasters"). Rozier has paid hundreds of thousands of dollars in legal fees to attorneys representing the Lasters in connection with the government's pre-charge investigation and the charged case. This evidence is highly probative of the nature of Rozier's relationships with his co-conspirators and casts doubt on Rozier's central defense in this case, which is that Laster engaged in the scheme behind Rozier's back and without Rozier's knowledge.

A. Applicable Law

The fact that one individual is paying another individual's legal fees is not protected by the attorney-client privilege and can be probative of the nature of the relationship between the payor of the legal fees and the person receiving the paid-for legal fees. The Second Circuit addressed this issue directly in In re Shargel, 742 F.2d 61, 64-65 (2d Cir. 1984). In Shargel, the Second Circuit stated:

> [T]he [attorney-client] privilege does not protect the identity of a 'benefactor' so far as legal fees are concerned. It is, of course, true that payment of another person's legal fees may imply facts about a prior or present relationship with that person. However, an attorney's ability to give

[7] The government respectfully requests an opportunity to file a reply brief on this issue if the defendants do not address it in their opening motions in limine brief, and to have oral argument on this issue.

> informed legal advice is not impaired by a rule allowing disclosure of such payments. Explanation of a particular relationship can be made and be protected by the privilege. The payment of another's legal fee is an act independent of that explanation and should not be accorded more protection against disclosure under the attorney-client privilege than a payment directly to the person for purposes of his or her retaining a lawyer. Whatever legal result might flow from application of the incrimination rationale, the view of the privilege we adopt thus denies protection to evidence indicating payment of one person's legal fees by another.

742 F.2d at 64-65. The principal holding of Shargel has been repeatedly reaffirmed. See, e.g., Lefcourt v. United States, 125 F.3d 79, 86 (2d Cir. 1997) (approvingly quoting Shargel and holding that, "As a general rule, a client's identity and fee information are not privileged."); United States v. Raniere, No. 18-CR-2041 (NGG), 2019 WL 2163189, at *6 (E.D.N.Y. May 16, 2019) (admitting evidence that a defendant "paid the legal fees for her co-defendants," which was "relevant as direct evidence" of, among other things, "the relationship between and among the defendants and co-conspirators"); United States v. Kandasamy, No. 06-CR-616 (RJD), 2008 WL 4224276, at *2 (E.D.N.Y. Sept. 11, 2008) ("the overwhelming weight of authority has consistently held that material relating to the payment of legal fees is non-privileged").

### B. Argument

The Court should admit evidence of Rozier's payment of Laster and his family's legal fees. Such evidence is highly probative. It is relevant to the nature of Rozier's relationships with his co-conspirators and of Rozier's contemporaneous knowledge of the charged scheme. See Raniere, 2019 WL 2163189, at *6. For example, at the direction of Laster and Laster's Brother, Laster's Sister placed a substantial bet on Rozier's unders in connection with the March 23 Game, which was subsequently disclosed by a betting operator to the NBA. When the NBA later interviewed Rozier for its internal investigation, he lied. Apparently trying to distance himself from Laster's Sister's bet, he claimed he did not know Laster's Sister and did not know that Laster had a sister. That claim conflicts with substantial evidence that Rozier and

Laster have been best friends since childhood, that Rozier has known Laster's Sister since that time, and that he had her saved as a contact in his phone at the time of the NBA's investigation. Evidence of Rozier paying Laster's Sister's legal fees is relevant because it further shows that he lied to the NBA about his relationship with a co-conspirator, and a jury may infer Rozier's consciousness of guilt from those false exculpatory statements.

Similarly, Rozier's defense is that Laster acted independently and without Rozier's knowledge. Yet Rozier continues to pay Laster's legal fees. They continued to communicate, post-indictment, in violation of their bond conditions. That makes little sense if Laster betrayed him. It is instead consistent with a conspiratorial relationship that continues to this day. Thus, Rozier's payment of the Lasters' legal fees is highly relevant because it is evidence of the close, continuing relationship between the two men that existed throughout the charged conspiracy and to the present.

Finally, this evidence easily passes Rule 403 analysis. As described above, this evidence is highly probative to the nature of Rozier's relationships with his co-conspirators, including Laster, Laster's Brother and Laster's Sister, and of Rozier's contemporaneous knowledge of the charged scheme.[8] In addition, admitting this evidence poses no risk of unfair prejudice. The payments are not inflammatory and speak for themselves, and the defendants will be free to cross-examine the government's witnesses, introduce their own evidence, and argue alternative explanations for the payments to the jury. Thus, because the probative value of this evidence is not substantially outweighed by any unfair prejudice, this evidence is admissible.

---

[8] Separately, evidence of Rozier's payment of the Lasters' legal fees would be admissible to impeach any of the Lasters should they testify at trial. Rozier's payment of hundreds of thousands of dollars toward their legal fees gives each of them a clear motive to shade their testimony in his favor, and the jury should be entitled to weigh that bias. See United States v. Abel, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

III. The Court Should Admit Lay Witness Testimony From Treating Medical Professionals

The government respectfully requests the Court rule that medical providers who treated Rozier during the course of the scheme may testify as fact witnesses, and need not be qualified as experts. These medical professionals should be permitted to testify both regarding their observations of Rozier's health based on their treatment of Rozier, and recounting their opinions at the time of Rozier's health status.

A. Relevant Facts

Approximately 10 days before the March 23 Game, Rozier complained to medical professionals associated with the Charlotte Hornets of right foot pain. Rozier was examined that day by one of the Hornets' medical trainers.

In the days immediately preceding the March 23 Game, Rozier told certain people close to him that the March 23 Game was going to be his last game of the season. However, Rozier did not tell the Charlotte Hornets' staff that he intended to exit the March 23 Game early or that he intended the March 23 Game to be his final game of the season. Indeed, Rozier was not on the official injury report issued by the Hornets prior to the March 23 Game. Nevertheless, after playing only nine minutes in the March 23 Game, Rozier exited the game on account of a supposed foot injury.

Immediately after Rozier exited the March 23 Game, he was examined by a doctor affiliated with the New Orleans Pelicans, the Hornets' opponent in the March 23 Game. A few days after the March 23 Game, Rozier had additional medical imaging performed on his right foot and the results of that imaging were examined by a medical professional. Rozier told others that he did not suffer a new injury in the March 23 Game.

B. Applicable Law

A physician or other medical professional can testify as a lay fact witness "as to

facts acquired and opinions formed during his 'personal consultation.'" Puglisi v. Town of Hempstead Sanitary District No. 2, No. 11–CV–0445 (PKC), 2013 WL 4046263, at *6 (E.D.N.Y. Aug. 8, 2013). "This is because if the witness testifies only to the opinions formed in providing plaintiff medical care, such opinions are considered an explanation of treatment and the physician may properly be characterized as a fact witness." Id. (internal quotations and alterations omitted) (collecting cases).

C. Argument

The Court should admit the testimony of the medical professionals who treated Rozier before, immediately after and in the days after the March 23 Game as lay, fact witness testimony.

First, such testimony is clearly relevant. The status of Rozier's foot injury before and after the March 23 Game is relevant to proving that Rozier intentionally exited the March 23 Game early, knowing that doing so would make it more likely his co-conspirators' wagers on his unders would be successful. More specifically, it will be relevant for the jury to understand the nature and extent of Rozier's injury prior to the March 23 Game, and the nature and extent of any injury suffered or exacerbated during the March 23 Game.

Second, as illustrated by Puglisi, courts regularly permit treating medical professionals to testify regarding their examinations, treatment plans and conclusions they drew regarding a patient's health as lay, rather than expert, witnesses. Importantly, the government will not seek to elicit from such witnesses a medical opinion rendered for the purpose of trial. Rather, such medical personnel will be called to testify about their opinions at the time for the purpose of establishing facts relevant to proving the crimes charged. This is lay, not expert, testimony, and does not require certifying such witnesses as experts.

## IV. The Court Should Admit Evidence of Attempted Obstruction and Tampering as Evidence of Consciousness of Guilt, or, in the Alternative, if the Defendants Open the Door

The government moves to introduce evidence at trial that a cooperating witness (the "CW") received threats aimed at intimidating the CW into not cooperating with the government. The CW will testify that these threats came from Laster and from a person the CW believed to be either Rozier or someone associated with him, and independent evidence will corroborate that testimony. This evidence is therefore admissible at the very least to show Rozier's and Laster's consciousness of guilt. See United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) (the Second Circuit has "upheld the admission of evidence of attempted witness or jury tampering as probative of a defendant's consciousness of guilt").

In addition, if either defendant suggests through cross-examination that the CW did not disclose certain information about the defendants to the government, and this undermines the CW's credibility, the government should be permitted to introduce evidence explaining the CW's reluctance to report on the defendants' crimes to dispel any misleading impression left with the jury. See Bohan v. Kuhlmann, 234 F. Supp. 2d 231, 269 (S.D.N.Y. 2002), aff'd, 66 F. App'x 277 (2d Cir. 2003) (permitting "redirect testimony about subjective fears where 'cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility'") (quoting United States v. Panebianco, 543 F.2d 447, 455 (2d Cir. 1976)); see also United States v. Diaz, 176 F.3d 52, 80 (2d Cir. 1999) (where the defense cross-examined a government cooperator about the government's payment for her relocation, the defense opened the door to redirect examination establishing that the funds were provided for her protection because she feared that the defendant would discover her cooperation) (citing United States v. Bilzerian, 926 F.2d 1285, 1296 (2d Cir. 1991) (redirect may be "used to rebut false impressions arising from cross-examination")).

Here, the CW's testimony, corroborated by independent evidence, would establish that any reluctance to cooperate against the defendants came not from a lack of knowledge about their conduct, but from fear of retribution, a fear that grew after the CW received the intimidating messages described above. Thus, as in Diaz, this evidence would complete the picture created on cross-examination and allow the jury to evaluate the CW's credibility in its proper context.

## V. The Court Should Admit Relevant Factual Evidence Relating to the NBA's Investigation, But Preclude Evidence or Argument that the NBA's Investigation Exonerated Rozier

After being alerted to suspicious wagers on Rozier's underperformance in the March 23 Game, the NBA opened an investigation. The government does not contend that the mere fact that the NBA commenced an investigation is probative of the defendants' guilt, nor does the government intend to introduce evidence or make argument to that effect. However, in connection with the NBA's investigation, the defendants made statements and took actions that are relevant and probative of the defendants' consciousness of guilt. The Court should admit evidence of these relevant statements and actions. However, any evidence regarding the NBA's conclusions or disciplinary actions flowing from its investigation—or the lack thereof—should be excluded as irrelevant.[9]

### A. Applicable Law

#### 1. Evidence of Consciousness of Guilt is Relevant and Admissible

Courts regularly admit evidence of a defendant's prior false exculpatory statements as probative of consciousness of guilt. "It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force." United States v. Parness, 503 F.2d 430, 438 (2d Cir. 1974); see

[9] To the extent the Court disagrees and admits evidence about the results of the NBA's investigation, the Court should issue a jury instruction both at the time of admission of such evidence, and in the jury instructions at the end of the case, limiting the jury's consideration of the results of this non-criminal investigation.

also Dawkins, 999 F.3d at 794 n. 93 (same) (collecting cases).

In addition, the Second Circuit and district courts have repeatedly approved of the admission of evidence of obstructive conduct as probative of consciousness of guilt. See, e.g., United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995) (evidence that defendant altered check stubs that were responsive to grand jury subpoena probative of defendant's consciousness of guilt on fraud-related charges); United States v. Robinson, 635 F.2d 981, 986 (2d Cir. 1980) (evidence that defendant tried to induce witness to sign a letter falsely exonerating other defendants and instructed co-conspirator to destroy passport admissible as evidence of consciousness of guilt); United States v. Zhong, No. 16-CR-614 (DLI), 2018 WL 6186474, at *8 (E.D.N.Y. Nov. 26, 2018) (evidence that defendant hid potentially incriminating material and directed family members to hide evidence admissible against defendant; evidence that defendant's co-conspirator arranged for potential witnesses to leave the United States to prevent their testimony also admissible against defendant), rev'd on other grounds, United States v. Zhong, 26 F.4th 536 (2d Cir. 2022). This is true irrespective of whether the defendant has been charged with obstruction of justice. For example, in United States v. Carpenter, the court granted the government's motion in limine to admit evidence that the defendant instructed his associates to remotely wipe the contents of an iPhone and to delete a music video that was relevant to the case. 372 F. Supp. 3d 74, 80 (E.D.N.Y. 2019). Despite the defendant's argument that such evidence should not be admitted because he was not charged with obstruction of justice, the court admitted the evidence on the basis that the defendant's "conduct is probative of the [d]efendant's consciousness of guilt." Id., at 80.

2. Evidence of the NBA's Findings is Irrelevant and Prejudicial

It is well-settled that a prior acquittal or other favorable outcome from a prior

proceeding, such as a decision not to prosecute, is not relevant at trial under Rule 401. See, e.g., United States v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979) ("A judgment of acquittal is relevant only to the legal question of whether the prosecution is barred by the constitutional doctrine of double jeopardy and collateral estoppel."); accord United States v. Kerley, 643 F.2d 299, 300-01 (5th Cir. 1981) ("We agree with the Government's position that evidence of a prior acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime."); United States v. Brown, No. 07-CR-874 (KAM), 2009 WL 497606, at *6 (E.D.N.Y. Feb. 26, 2009) (state prosecutor's decision not to prosecute is irrelevant); Duttle v. Bandler & Kass, No. 82-CV-5084 (KMW), 1990 WL 113187, at *4 (S.D.N.Y. July 25, 1990) (evidence of a failure to indict is irrelevant and impermissible hearsay). Other appellate courts have reached similar conclusions. United States v. Marrero-Ortiz, 160 F.3d 768, 775 (1st Cir. 1998); Prince v. Lockhart, 971 F.2d 118, 122 (8th Cir. 1992); United States v. Jones, 808 F.2d 561 (7th Cir. 1986); United States v. Irvin, 787 F.2d 1506, 1517 (11th Cir. 1986).

Courts also frequently exclude such evidence under Rule 403. See, e.g., United States v. Gambino, 818 F. Supp. 536, 539 (E.D.N.Y. 1993) (prior acquittal inadmissible because of, among other reasons, "the danger it would present for confusion of the issues and misleading the jury); United States v. Klein, No. 16-CR-442 (JMA), 2017 WL 1316999 (E.D.N.Y. Feb. 10, 2017) (SEC decision not to charge defendant inadmissible under Rule 403); United States v. Halteh, 224 F. App'x 210, 214 (4th Cir. 2007) (affirming district court's exclusion of evidence of acquittal on prior charges relating to the same conduct on the basis that any probative value was "substantially outweighed by the danger of unfair prejudice or jury confusion").

B. Argument

1. The Court Should Admit Evidence Relating to the Defendants' Conduct in Connection with the NBA Investigation

The government intends to introduce evidence at trial that both Rozier and Laster lied in material ways during the interviews conducted by the NBA. These false exculpatory statements are plainly probative of the defendants' consciousness of guilt and as evidence of the co-conspirators' attempts to evade detection by the NBA. For example, as described more fully above, Rozier lied to the NBA regarding his relationship with Laster's Sister, who placed a fraudulent wager on the March 23 Game. As another example, Laster falsely stated that he had no knowledge of anyone placing bets on Rozier's unders in connection with the March 23 Game. But, as the government will prove at trial, Laster helped run the scheme and, prior to the March 23 Game, sent and received betting slips for Rozier under bets on the game.

In addition, the government intends to introduce evidence that Rozier withheld evidence that was requested of him by the NBA, which he was required to provide to the NBA under the terms of his employment. As one example, when requested to provide the NBA with his cell phone, Rozier only provided the NBA with one of his two cell phones and with one of his two phone numbers. The government also intends to introduce evidence that during the NBA's investigation, Rozier deleted key evidence from his electronic devices. For example, Rozier deleted from the phone he provided to the NBA for forensic imaging his entire text message chain with one of his co-conspirators. In addition, on the day Rozier provided one of his phones to the NBA for imaging, Rozier searched his second phone (which he did not provide to the NBA) for his text messages with the same co-conspirator. The Court should admit evidence of these obstructive efforts as probative of Rozier's consciousness of guilt.

2. The Court Should Preclude Evidence or Argument Relating to the NBA's Findings in Connection with Its Investigation

The Court should preclude evidence of the NBA investigation's conclusions, if any. Such evidence is irrelevant or, to the extent it has some marginal relevance, is substantially more prejudicial than probative.

First, the NBA's conclusions are irrelevant to the jury's determination of guilt or innocence. The NBA investigated violations of its rules, not violations of criminal statutes. In conducting its investigation, the NBA was limited in its ability to obtain evidence. The NBA did not have the power to serve subpoenas, execute search warrants or compel non-NBA witnesses to speak. And even when he was required to do so, Rozier hid information from the NBA and lied to its investigators. Any conclusion drawn by the NBA was, consequently, one drawn based on a limited and incomplete record that pales in comparison to the record that will be presented to the jury at trial. Whether the NBA determined, based on the limited evidence it had access to, that Rozier did not engage in any wrongdoing in connection with the March 23 Game is simply not relevant to the jury's determination, based on a much fuller record, of whether Rozier engaged in the charged criminal conduct.

Second, the government understands that the NBA has not made any final determinations as to whether Rozier engaged, or did not engage, in conduct meriting punishment in connection with the March 23 Game. The NBA's investigation into Rozier's conduct in connection with the March 23 Game remains open, and the NBA has not cleared Rozier. Following the unsealing of the indictment, the NBA placed Rozier on administrative leave.

Third, any conceivable probative value of a theoretical determination by the NBA that Rozier had not engaged in wrongdoing would be inadmissible under Rule 403 because that limited probative value would be substantially outweighed by the risk of confusing the issues and

misleading the jury. Any reliance on the NBA's conclusions suggests a false equivalency between, on the one hand, the government's investigation and the jury's determination, and, on the other hand, the NBA's investigation and its conclusions. Reference to the NBA's conclusions would be an invitation to the jury to substitute the NBA's judgment (based on a different record) for its own judgment based on the record of evidence admitted at trial. Courts have routinely excluded evidence regarding the conclusions drawn by a third party as a result of a separate investigation based on Rule 403. See United States v. Klein, No. 16-CR-442 (JMA), 2017 WL 1316999, at *9 (E.D.N.Y. Feb. 10, 2017) (Schulman [the criminal defendant not charged in the SEC case] proposes diverting the jury's attention away from the question whether the prosecution has satisfied its burden of proof and towards the question whether the SEC or DOJ 'got it right.' Posing such a question to the jury . . . invites a substantial danger of confusion. And, such a proposal invites an even increased danger of unfair prejudice and confusion here, since the DOJ and SEC made their decisions based on different bodies of evidence.").

## VI. The Court Should Preclude Evidence or Argument Regarding the Government's Motives, Charging Decisions and Investigative Techniques, or Potential Punishment

On numerous occasions, Rozier's former counsel publicly questioned the government's "motivations in this case" and the integrity of Rozier's arrest,[10] and characterized the government's prosecution of Rozier as a "trophy hunt."[11] Putting aside that these allegations

[10] See, e.g., Ryan Gaydos and David Spunt, Fox News, NBA player Terry Rozier's lawyer slams FBI after arrest, available at https://www.foxnews.com/sports/nba-player-terry-roziers-lawyer-slams-fbi-after-arrest (Rozier's former counsel stating, "It is unfortunate that instead of allowing him to self surrender [the government] opted for a photo op. [The government] wanted the misplaced glory of embarrassing a professional athlete with a perp walk. That tells you a lot about the motivations in this case.").

[11] Minyvonne Burke and David K. Li, NBC News, NBA star Terry Rozier's role in sports betting scandal puts scrutiny on how injuries are verified, available at https://www.nbcnews.com/sports/nba/nba-players-faking-injuries-gambling-rcna239588.

are baseless, the Court should preclude Rozier from introducing evidence or making arguments before the jury that put at issue the government's motives, charging decisions, or investigative techniques. Such evidence and argument are irrelevant to innocence or guilt and present a substantial risk of misleading the jury or inviting jury nullification. They should be precluded.

A. Applicable Law

Arguments regarding the government's motives, decision to charge certain defendants or investigative techniques are irrelevant, unduly prejudicial and improperly invite jury nullification. See United States v. Armstrong, 517 U.S. 456, 463 (1996) (claim that a prosecution has been brought selectively, or for improper motives, "is not a defense on the merits to the criminal charge"); United States v. Knox, 687 F. App'x 51 (2d Cir. 2017) (jury properly instructed that "government is not on trial"); United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011) (affirming district court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); United States v. Saldarriaga, 204 F.3d 50, 52 (2d Cir. 2000) ("government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true . . . the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged"); United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"). Nor may a defendant mention the consequences of a potential conviction, since punishment is not a fact "of consequence" to be determined at trial and therefore irrelevant. See Shannon v. United States, 512 U.S. 573, 579 (1994).

B. Argument

The Court should preclude any such evidence or argument on these topics, which are clearly verboten under the case law. The jury's attention belongs on "the evidence or lack of evidence that had been presented at trial," Saldarriaga, 204 F.3d at 52, not on the government's purported motives, charging decisions, investigative techniques, or on the potential consequences of conviction. Evidence concerning such matters is irrelevant, and introduction of evidence or argument concerning the motives behind the government's investigation would present an unacceptable risk of confusing the issues and misleading the jury.

VII. The Court Should Preclude the Defendants From Raising or Arguing Purported Misconduct by the Victims or Any Lack of Harm to the Victims

At trial, the defendants should not be permitted to introduce evidence or advance arguments that seek to shift blame to the victims identified in the Superseding Indictment—the Charlotte Hornets, the NBA, and the betting operators with which the fraudulent wagers were placed—or otherwise portray them as deserving of the alleged fraud. The Court should therefore preclude the defendants from arguing that the betting operators, the Hornets or the NBA are harmful to society, engage in negligent or otherwise improper conduct, are unsympathetic victims or that any alleged misconduct by the victims negates the defendants' criminal liability.

Evidence relating to victim negligence or misconduct is irrelevant to the question of the defendants' guilt and is an improper defense. Just as it is no defense to burglary charges that the victim left a front door unlocked or that the victim was unsympathetic, it is no defense to fraud that the victim was negligent or allegedly harmful to society. See United States v. Allen, 201 F.3d 163, 167 (2d Cir. 2000) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense[.]"); United States v. Thomas, 377 F.3d 232, 243-44 (2d Cir. 2004) (affirming restrictions on cross-examination of

victim; rejecting defendant's argument that victim's foolishness vitiated fraudulent intent).

Moreover, the Court should bar the defendants from offering evidence or argument at trial that the victim betting operators lost little or no money, or that the defendants did not intend to cause them financial loss. See Kousisis v. United States, 605 U.S. 114, 118, 124 (2025) (wire fraud statute "does not so much as mention loss, let alone require it").

Thus, evidence or argument about the victims' alleged negligence, misconduct, or harmful effects on society, or the betting operators' actual or intended losses, has no bearing on any element of the charged offenses, would confuse the issues and mislead the jury, and should be excluded under FRE 401, 402, and 403.

## VIII. The Court Should Preclude the Defendants From Introducing Improper Evidence of Good Character

The Court should bar Rozier from offering evidence or argument at trial—including during opening statements—about his personal or family background, including his lack of a criminal record and other supposed "good acts." Such evidence and argument would distract from the issues the jury must decide, risk confusing the jury and inviting nullification, and draw sympathy based on irrelevant matters.

Courts routinely preclude evidence relating to a defendant's family life, charitable giving, and the like as irrelevant. See, e.g., United States v. Battaglia, No. 05-CR-774, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 16, 2008) (precluding "evidence of Defendant's family and personal status" because it was not "relevant to the issue of whether Defendant committed the crimes charged"); see also United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of unrelated charitable giving).

The Court should preclude such evidence here because it is not relevant to whether he conspired to pull himself early from a game in exchange for a bribe. A pretrial ruling

is important to ensure defense counsel does not open on these irrelevant topics.

Moreover, even if Rozier could show that a particular character trait is relevant to an element of the charged offenses, any character witness must be limited on direct examination to reputation or opinion testimony and should not be permitted to testify about specific instances of Rozier's conduct. See FRE 405(a); United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *7 (E.D.N.Y. Dec. 20, 2019) ("Although a character witness may give general testimony concerning the defendant's reputation for a "pertinent trait of character" or the witness's opinion of the defendant with regard to that trait, '[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.'") (citing and quoting FRE 404 and 405).

## IX. The Court Should Preclude Rozier From Misstating the Law Governing the Affirmative Defense of Withdrawal

The Court should preclude Rozier from arguing that he withdrew from the conspiracy because he went over on rebounds. Withdrawal is an affirmative defense, and the defendant bears the burden of proving that he affirmatively withdrew from the conspiracy. See United States v. Leslie, 658 F.3d 140, 143–45 (2d Cir. 2011). Mere cessation of conspiratorial activity, without more, is insufficient to establish withdrawal. Id. Rather, a conspirator's "membership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw." United States v. Flaherty, 295 F.3d 182, 192 (2d Cir. 2002). To establish withdrawal, the defendant must take affirmative action to disavow or defeat the purpose of the conspiracy, such as "the making of a clean breast to the authorities" or communicating his abandonment of the conspiracy "in a manner reasonably calculated to reach co-conspirators." United States v. Watts, 934 F. Supp. 2d 451, 474–75 (E.D.N.Y. 2013).

Rozier cannot satisfy this affirmative defense. Even assuming arguendo that Rozier intentionally went over on rebounds, that fact does not establish that he withdrew from the conspiracy. Indeed, Rozier did not affirmatively disavow the conspiracy, communicate his abandonment to his co-conspirators, inform law enforcement of his withdrawal, or otherwise take any action calculated to defeat the conspiracy's purpose. At most, Rozier's conduct demonstrates that one aspect of the scheme was not carried out as contemplated.

Accordingly, the Court should preclude Rozier from arguing that his rebounding performance establishes that he withdrew from the conspiracy. Such an argument would risk confusing the jury about the elements of conspiracy and the affirmative defense of withdrawal.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motions in limine in their entirety.[12]

Dated: Brooklyn, New York
November 12, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant United States Attorneys
(718) 254-7000

[12] The government respectfully submits that the facts set forth herein regarding [redacted] testimony provide support for the "specific, on the record findings" required to justify sealing. See Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006).